Bruce Berline
LAW OFFICE OF BRUCE BERLINE, LLC
Security Title Building
Isa Drive, Capitol Hill
PO Box 5682 CHRB
Saipan, MP 96950
Tel.: (670) 233-3663
Fax:  (670) 233-5262
Email: bberline@gmail.com

Aaron Halegua
AARON HALEGUA, PLLC
524 Broadway, 11th Floor
New York, New York 10012
Tel.: (646) 854-9061
Email: ah@aaronhalegua.com

John-Patrick M. Fritz
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Ave.
Los Angeles, CA 90034
Tel: (310) 229-3395
Email: jpf@lnbyg.com

Attorneys for Joshua Gray

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS
BANKRUPTCY DIVISION**

| | |
|---|---|
| In re<br><br>IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC,<br><br>Debtor and Debtor-in-Possession. | Case No. 1:24-bk-00002<br><br>**AMENDED OPPOSITION BY JOSHUA GRAY TO DEBTOR'S MOTION TO APPROVE BID PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS AND RELATED RELIEF**[1]<br><br>Hearing Date: September 19, 2024<br>Hearing Time: 8:30 a.m.<br>Judge: Hon. Ramona V. Manglona |

---

[1] This brief is intended to amend and replace the Opposition previously filed by Gray (ECF No. 208) before the stipulation extending Gray's deadline to file this brief was granted (ECF No. 213).

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................... iii

I. INTRODUCTION ......................................................................................................1

II. LEGAL STANDARD ................................................................................................1

III. ARGUMENT ..............................................................................................................3

    A. The Sale Procedures are not designed to maximize the value of the Debtor's assets or otherwise produce a sale that the Court can confirm. ..............3

        1. The sale procedure is not reasonable and will not maximize value to the estate because the contents and value of the assets being sold is unknown, and the procedure is flawed and inadequate. ............................................................3

        2. The sale procedure is not made in good faith and thus will not produce a confirmable sale. ..............................................................................................5

        3. Mr. Sit should not be permitted to bid on credit. ............................................6

        4. Mr. Sit should not be entitled to a break-up fee. ............................................7

    B. The Complete Personal Property and Causes of Action should be marketed and sold separately from the Hotel and Leasehold. .................................8

        1. Lumping the personal property and causes of action together with the Hotel will not maximize the value obtained for those assets. ...............................9

        2. A separate sale of the Complete Personal Property will avoid extensive, costly litigation over the amount paid or these assets as a proportion of the total sales prices. ......................................................................................11

IV. CONCLUSION ........................................................................................................12

# TABLE OF AUTHORITIES

<u>CASES</u>

*Cottle v. Storer Communication* Inc., 849 F.2d 570, 578 (11th Cir. 1988) ................................... 7

*Czyzewski v. Jeci Holding Corp.*, 580 U.S. 451 (2017) ...................................................................... 7

*In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) ................................. 4–5

*In re Atlanta Packaging Products*, Inc., 99 B.R. 124 (Bankr. N. D. Ga. 1988) ............................. 2

*In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y. 1990) ............................... 2

*In re Exennium, Inc.*, 715 F.2d 1401 (9th Cir. 1983) ........................................................................ 5

*In re Fehl*, 19 B.R. 310 (Bankr. N.D. Cal. 1982) ......................................................................... 2, 5

*In re Huntington, Ltd.*, 654 F.2d 578 (9th Cir. 1981) .................................................................. 1–2

*In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.*,
     77 B.R. 15, 17 (Bankr. E.D. Pa. 1987) ........................................................................................ 5

*In re Integrated Resources, Inc.*, 147 B.R. 650, 657 (S.D.N.Y. 1992) ........................................... 7

*In re M Capital Corp.*, 290 B.R. 743 (9th Cir. B.A.P. 2003) ........................................................ 5

*In re Smith*, 349 B.R. 28 (Bankr. D. Idaho 2005) ........................................................................... 4

*In re Valley Bldg. Supply, Inc.*, 39 B.R. 131 (Bankr. D. Vt. 1984) ................................................ 6

*In re Wilde Horse Enterprises*, 136 B.R. 830 (Bankr. C. D. Cal. 1991) ....................................... 5

*Matter of CADA Invs., Inc.,* 664 F.2d 1158 (9th Cir. 1981) .......................................................... 5

*RadLAX v. Gateway Hotel, LLC v. Amalgamated Bank*, 556 U.S. 639 (2012) .......................... 6–7

*Titusville Country Club v. Pennbank (In re Titusville Country Club)*,
     128 B.R. 396 (Bankr. W.D. Pa. 1991) ....................................................................................... 2

*In re Walter*, 83 B.R. 14 (9th Cir. B.A.P. 1988) .............................................................................. 2

STATUTES

11 U.S.C. § 363 ...............................................................................................................................1, 6

## I. INTRODUCTION

Judgment creditor Joshua Gray ("Gray")[2] respectfully submits his opposition (the "Opposition") to the "Motion to Approve Bid Procedures for Sale of Substantially All of the Debtor's Assets and Related Relief" (ECF No. 182 (the "Motion")) filed by Imperial Pacific International (CNMI), LLC, the debtor and debtor in possession (the "Debtor") in the above-captioned Chapter 11 bankruptcy case. The Motion proposes a procedure designed to deliver virtually all the Debtor's assets to a friend of the Debtor at a lowball price—and must be rejected. First, the proposed procedure will fail to maximize the value of the Debtor's assets because the contents of what is being sold are still unknown, no appraisal has been performed, no investment banker has been hired, and there are no adequate procedures for due diligence or marketing the assets. Second, the proposed procedure demonstrates bad faith by the Debtor because it attempts to transfer the assets to an insider without a competitive bidding process, and gives unfair treatment to Mr. Sit at the expense of secured and other creditors. And, third, the proposed procedure is flawed because it essentially gives away the Complete Personal Property and Causes of Action (defined below) to the winning bidder rather than maximizing the value that can be obtained for those assets by conducting a separate sale process. Therefore, the Motion should be denied in its entirety.

## II. LEGAL STANDARD

Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. § 363 (b)(1). In the Ninth Circuit, "cause" exists for authorizing a sale of estate assets only where it is in the best interest of the estate, and a reasonable business justification exists for authorizing the sale. *In re*

---

[2] On August 22, 2024, Gray filed proof of claim number 15 on the Debtor's claim register asserting a secured claim of no less than $5,467,083.29, which includes copies of Gray's recorded judgment lien and documents related to his writ of execution on IPI's personal property.

1

*Huntington, Ltd.*, 654 F.2d 578 (9th Cir. 1981); *In re Walter*, 83 B.R. 14, 19-20 (9th Cir. B.A.P. 1988). In considering what is in the best interest of the estate, it is "a well-established principle of bankruptcy law that the objective of bankruptcy sales and the [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 131 (Bankr. N. D. Ga. 1988).

A sale must satisfy several requirements for a bankruptcy court to find that it is in the best interest of the estate, including that: (1) there is a sound business reason for the sale; (2) accurate and reasonable notice of the sale was provided to interested persons; (3) the sale yielded an adequate price (i.e., one that is fair and reasonable); and (4) the parties to the sale have acted in good faith. *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *see also, In re Walter*, 83 B.R. at 19–20 (proposed use of assets not in the best interest of the estate). Additionally, courts have long recognized the need for competitive bidding in private sales because it "yields higher offers and thus benefits the estate… [and thus] the objective is to maximize bidding, not restrict it." *In re Atlanta Packaging Products*, 99 B.R. at 131 (internal quotations omitted).

If the aforementioned sale conditions are not met, then the sale is to be rejected and the process must begin again. *See, e.g.*, *In re Fehl*, 19 B.R. 310, 312 (Bankr. N.D. Cal. 1982) (denying motion to confirm sale of real property because of deficient notice procedures and an inadequate sales price, and ordering that a new sale be conducted); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 886 (Bankr. S.D.N.Y. 1990) (the court should not cherry-pick provisions and rewrite the sale agreement). Accordingly, Gray requests that the Court decline to amend or rewrite the Debtor's sale procedure, but rather reject the Motion in its entirety as an unreasonable exercise of business judgment.

### III. ARGUMENT

Gray respectfully submits that the Debtor's sale process is not based on reasonable business judgment, it serves numerous illegitimate purposes, and it will not result in the highest price to be obtained for the assets. Specifically, the sale procedures, inter alia, (i) do not foster competitive bidding among any serious potential purchasers; (ii) fail to provide adequate marketing by a qualified investment banker; (iii) fail to provide adequate time for due diligence; and (vi) pay an unfair "break-up fee" to an insider as a dealer's premium without any actual benefit to the estate; (v) improperly permit Mr. Sit to submit a credit bid; (vi) will not generate maximum value for certain assets, such as the Complete Personal Property and Causes of Action (defined below), because they are lumped together with the Hotel; and (vii) invite litigation about the price paid for the Complete Personal Property as part of the total asset sale.

**A. The Sale Procedures are not designed to maximize value of the Debtor's assets or otherwise produce a sale that the Court can confirm.**

If the proposed sale procedures are approved, they will not promote the ultimate goal of a sale under 11 U.S.C. § 363(b) that returns maximized value to the estate and its creditors. Instead, the sale procedures are a waste of estate time and resources to the detriment of creditors, and will likely prejudice any future efforts to sell the assets under a new procedure.

1. <u>The sale procedure is not reasonable and will not maximize value to the estate because the contents and value of the assets being sold is unknown, and the procedure is flawed and inadequate.</u>

The Debtor has provided virtually no analysis or justification as to the reasonableness of its proposed sale procedure that involves selling essentially all of the Debtor's assets and using an insider, Mr. Sit, as the stalking horse bidder at a lowball price of $10 million. Critically, the Debtor has provided no assessment of the value of the assets that it is proposing to sell, let alone an analysis of why $10 million is a fair starting (and potentially final) bid for those assets. There has been no

3

appraisal of the Hotel, the Personal Property, or the Causes of Action that are all part of the sale. Indeed, the Debtor's sale proposal also includes a sale of the 90 shipping containers that belong to the Debtor, despite the fact that the Debtor does not even know the contents (let alone value) of what is inside those containers. The Debtor has not hired an investment banker or other professional to opine on the fair market value of the Debtor's assets, what particular assets to include and exclude in a sale of the Hotel, an appropriate price at which to start the bidding, how long the marketing process should take, or other essential questions. Without this baseline, it will also be impossible for the Court to determine whether the price ultimately obtained for the Hotel or other assets is fair or adequate. *See, e.g., In re Smith*, 349 B.R. 28, 37 (Bankr. D. Idaho 2005) (rejecting sale as inadequate even where experts had testified as to appropriate value of the asset in question); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149 (3d Cir. 1986) (obtaining over 75% of appraised value constitutes fair value for property sold in bankruptcy).

Instead of going through a proper process, the Debtor seems to have almost pulled the $10 million price out of thin air. However, the impact of the Debtor's actions is enormous, as it will chill others from participating in the bidding process; and, to the extent anyone still comes forward to bid, their offers will now be anchored around this lowball number. Furthermore, the sale procedure put forth by the Debtor is silent as to how the Debtor's assets will be marketed, how potential buyers will be notified, or why a period of just a few months is adequate to solicit bids for this property. The reality, as stated in Michael Dotts' opposition, is that it will be virtually impossible for any party seriously considering bidding on the hotel to conduct ample due diligence within the proposed timeframe. (ECF No. 204). The hotel alone has been sitting idle for a number of years and there has been no independent evaluation as to its structural integrity or current state.

On this basis alone, the Court should deny the Motion and decline to approve Debtor's deficient proposed sale procedures. Proper sale procedures would first contemplate a full inventory of

the assets (including the 90 storage containers) and due diligence as to their current state, the employment of a qualified investment banker, input from appropriate professionals on marketing and soliciting bids. If the current proposed sale procedures are followed, it will inevitably produce a result to which there are numerous objections and the Court will be unable to approve. In short, this will be a total waste of the estate's resources as well as negatively impact any future sales effort. *See, e.g., In re Fehl*, 19 B.R. at 312 (denying motion to confirm sale of real property because of deficient notice procedures and an inadequate sales price, and ordering that a new sale be conducted); *Matter of CADA Invs., Inc.,* 664 F.2d 1158, 1158 (9th Cir. 1981) (affirming bankruptcy court order to set aside a confirmed sale of real property after problems with bidding procedures discovered).

2. <u>The sale procedure is not made in good faith and thus will not produce a confirmable sale.</u>

A sale may only be approved where it is undertaken in good faith. *In re Wilde Horse Enterprises*, 136 B.R. 830, 842 (Bankr. C. D. Cal. 1991). With respect to a debtor's conduct in conjunction with the sale, the good faith requirement "focuses principally on the element of special treatment of the Debtor's insiders in the sale transaction." *See In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987). Mr. Sit's relationship to the Debtor and its chief investor, Mr. Ji Xiaobo, has already been disclosed in these proceedings; if he is not an "insider," he is at least a closely-related party warranting the same scrutiny as an insider. (*See* ECF No. 207 at 2–3) (noting that Mr. Sit was originally approached by a "friend of the debtor"). The Debtor's sale procedure that puts forth a lowball bid by this insider after an inadequate marketing process is a collusive process designed to suppress competing bids and, therefore, is not an arms-length transaction and is not proposed in good faith. *In re Abbotts Dairies*, 788 F.2d at 147; *In re Wilde Horse Enterprises, Inc.*, 136 B.R. at 842; *In re Exennium, Inc.*, 715 F.2d 1401, 1404-05 (9th Cir. 1983); *In re M Capital Corp.*, 290 B.R. 743 (9th Cir. B.A.P. 2003). Therefore, a sale resulting from such a sales process could not be approved.

3. <u>Mr. Sit should not be permitted to bid on credit.</u>

The Debtor's sale proposal permits Mr. Sit to submit a credit bid based on the funds that he provided in the DIP loan (Motion at 17), which is entirely inappropriate and represents a bad faith effort to prioritize Mr. Sit's claim to be repaid over the secured creditors in this case. The Bankruptcy Code has a provision for the purchaser of property in a Section 363 sale to offset the sale price, but this is for parties that hold "a lien that secures an allowed claim." 11 U.S.C. § 363(k). Mr. Sit is not a secured creditor with a lien. The DIP loan in this matter was made on an unsecured administrative priority basis—thus, it is not a secured claim. By contrast, the Debtor's Schedule D lists three secured claims valued at over $17 million, and Joshua Gray, Michael Dotts, and U.S.A. Fanter have secured claims that totally nearly an additional $6 million. If Mr. Sit were able to apply the amount of his prior DIP loan to pay for the Hotel, he is effectively getting his unsecured loan repaid prior to these secured creditors getting paid out of the sale of the Debtor's assets, which is inappropriate. *See In re Valley Bldg. Supply, Inc.*, 39 B.R. 131, 132-133 (Bankr. D. Vt. 1984) (an offset is allowed only to the extent of the purchaser's interest in the property over and above senior liens immediately prior to the sale).

Providing an unsecured creditor with a credit bid ahead of the secured claims of secured parties cannot stand muster based on a combination of two Supreme Court decisions. First, the Supreme Court has defended a *secured creditor's* right to credit bid and reversed a plan and sale procedures order when the bid procedures denied a secured creditor's rights. *RadLAX v. Gateway Hotel, LLC v. Amalgamated Bank*, 556 U.S. 639, 644 (2012) ("since the debtors' proposed auction procedures do not permit the [secured creditor] Bank to credit-bid, the proposes sale cannot satisfy the requirements clause [11 U.S.C. § 1129(b)(2)(A)](ii)").[3] Second, the Supreme Court has noted that "[t]he

---

[3] The case of *RadLAX* involved a combined sale-plan, as permitted by 11 U.S.C. § 1123(a)(5)(D), for which secured creditors are entitled to credit bid rights for their protection, pursuant to 11 U.S.C. § 1129(b)(2)(A)(ii), referencing 11 U.S.C. § 363(k). The distinction between a straight sale as opposed to a sale-plan is irrelevant, as the Supreme Court ruled: "As a matter of law, no bid procedures like

6

[Bankruptcy] Code sets forth a basic system of priority, which ordinarily determines the order in which the bankruptcy court will distribute assets of the estate. Secured creditors are highest on the priority list, for they must receive the proceeds of the collateral that secures their debts." *Czyzewski v. Jeci Holding Corp.*, 580 U.S. 451, 457 (2017). The Supreme Court reversed and remanded the bankruptcy court for approving a contested distribution of proceeds that upset the Bankruptcy Code's priority scheme. *Id.* at 471. Upsetting the priority scheme over the objection of creditors has "potentially serious consequences," which "include departure from the protections Congress granted particular classes of creditors." *Id.* at 470. Here, Debtor's proposal to elevate Mr. Sit's unsecured claim to credit bid as if it were a secured claim senior to the actual secured creditors' claims is an impermissible reordering of Bankruptcy Code priorities and protections that cannot be approved.

4. <u>Mr. Sit should not be entitled to a break-up fee.</u>

The sale proposal by the Debtor states that Mr. Sit will receive a break-up fee of $200,000 plus return of his deposit if he is not the winning bidder, which is another bad faith attempt to funnel money to an insider. (Motion at 18). In the bankruptcy context, a break-up fee or expense reimbursement is generally permissible if reasonably related to the bidder's efforts and the transaction's magnitude. *Cottle v. Storer Communication* Inc., 849 F.2d 570, 578 (11th Cir. 1988). A break-up fee is not permissible where it is (1) the product of self-dealing by the debtor or the trustee, (2) likely to hamper or chill, rather than encourage, bidding on the assets to be sold, or (3) unreasonably large in relation to the proposed purchase price. *In re Integrated Resources, Inc.*, 147 B.R. 650, 657 (S.D.N.Y. 1992).

Here, the break-up fee to Mr. Sit does not pass muster. Firstly, Mr. Sit has already done due diligence and knows the Debtor's assets from his efforts to make a post-petition loan (DIP financing)

---

the ones proposed here [denying credit bid protections to *secured creditors*] *could* satisfy the requirements of § 1129(b)(2)(A), and the distinction between approval of the bid procedures and plan confirmation is therefore irrelevant." *RadLAX v. Gateway Hotel, LLC v. Amalgamated Bank*, 556 U.S. 639, 649 (2012) (emphasis in original).

7

to the Debtor. Moreover, the common reason for a break-up fee, i.e., incentive to participate in the sale process and possibly not be the winning bidder, is unnecessary here because Mr. Sit already has an incentive for a successful sale, to wit, a successful sale is necessary to repay his DIP financing loan. Furthermore, both the opening stalking-horse bid as well as the proposed break-up fee are likely to be under-market and chill bidding because the Debtor failed to engage a qualified investment banker to pan the market for the optimum stalking-horse bid in the first place. (*See* ECF No. 188 at 2) ("Without the benefit of a robust process to establish the true market value, a low-ball stalking horse bid unfairly distorts the value of the assets and 'chills' the bidding process by dissuading third parties from submitting their highest and best offers."). Finally, the break-up fee is the product of self-dealing between the Debtor and insider Mr. Sit and will not benefit the estate. Accordingly, the break-up fee provision should not be approved and is further demonstration that the proposed sale procedure is not offered in good faith.

**B. The Complete Personal Property and Causes of Action should be marketed and sold separately from the Hotel and Leasehold.**

A major flaw in the proposed sale procedures is that the Debtor proposes selling virtually all of the Debtor's assets, including all tangible personal property and all causes of action (except the Excluded Claims), together with the Debtor's leaseholds and Hotel. However, despite the Debtor's awareness that there have already been independent efforts to market and sell such property, the Debtor provides no analysis or explanation for the decision to lump these assets together.[4] Indeed, there is no logical reason why a billion dollars of gambling debts should be sold together with the unfinished Hotel building. Similarly, the purchaser of the Hotel, which would not realistically open

---

[4] The Debtor's sale proposal does not even acknowledge the fact that this Court has already ordered that at least 11 of the more valuable Debtor's vehicles be sold independently of the sale of the hotel and other assets. (*See* ECF No. 189).

8

for many years, will not pay much for old vehicles, cigars, and bottles of wine. Therefore, the secured creditors in this case—Gray, U.S.A. Fanter, Michael Dotts, and the Commonwealth of the Northern Mariana Islands—jointly agree that at least the personal property and causes of action should be marketed and sold through a separate process.[5]

   1. <u>Lumping the personal property and causes of action together with the Hotel will not maximize the value obtained for those assets.</u>

Under the current proposal, the "Acquired Assets" (i.e. assets to be sold) includes "all tangible property, accounts, machinery, equipment, inventories, … hardware, any rights, claims or causes of action of the Debtor … [and] the Personal Property, Designated Contracts, Real Property Leases and the Debtor's interest in IPP." (Motion at 6). The "Personal Property" includes "all personal property identified in Part 5 (Inventory), Part 7 (Office furniture, fixtures, and equipment; and collectibles), and Part 8 (Machinery, equipment, and vehicles) to Schedule 'B' of the Debtor's Schedules and Statement of Financial Affairs, filed in the Debtor's bankruptcy case as dkt # 74 ["IPI's Schedules"], as may be amended." (*Id.* at 15). Part 5 includes "construction materials" and "90 containers of construction materials" held at the Port of Saipan of "unknown" value, 1276 bottles of wine, and 712 boxes of cigars (ECF No. 74 at 4–5); Part 7 includes computer equipment, non-office furniture and equipment, phone equipment, maintenance equipment, forklifts and lifting equipment, and laundry equipment (*id.* at 5–6); and Part 8 includes 99 vehicles (*id.* at 6).

In its Schedules, the Debtor estimates that the current value of the tangible property mentioned above is $1,650,200, not including the unknown value of the 90 containers. (*Id.* at 4–6). The Debtor

---

[5] Specifically, the secured creditors agree that at least the following items should be sold through separate marketing and auction processes: (i) the Personal Property (as defined in the Motion), all property subject to the Writs of Execution in the *Fanter v. IPI* and *Gray v. IPI* cases, and all other tangible property, machinery, equipment, inventories, hardware, and art or installations ("Complete Personal Property"); as well as (ii) all rights, claims, and causes of action belonging to the Debtor that relate to outstanding gambling debts ("Causes of Action").

lists the value of its Accounts Receivable as $4,687,770. (*Id.* at 4). The Debtor also lists the value of its causes of action against third parties as "unknown," but notes that the claims are for more than $1.26 billion in unpaid debts. (*Id.* at 8–16).

It is common sense that under the current sale procedure proposed by the Debtor, the personal property and causes of action will essentially be given away to the bidder for the Hotel. The Debtor has admitted that it no longer has an operating business. The Hotel has been shuttered for over four years and the Debtor has estimated that an investment of $100 to $150 million, and undoubtedly many years, will be necessary to complete construction. A party who is willing to invest that amount of capital is not going to be raising their bid because it will win 1,276 bottles of red wine, 712 boxes of cigars, or a collection of old, deteriorating vehicles. (ECF No. 74). It is also clear that the type of party investing in completing the Hotel project is not in the business of pursuing unpaid gambling debts. Instead, it is obvious that these items will essentially just be given away to a party that is primarily interested in the Hotel and Leasehold. This is the precise opposite of the Bankruptcy Code's dictate to maximize the value of these assets being sold.

By contrast, based on the experience thus far, Gray and the other secured creditors agree that considerable value can be obtained for the Personal Property and perhaps Causes of Action if they are marketed and sold separately. It is apparent that there are many parties who would be interested in bidding on the vehicles, wine, cigars, or other property but have neither the interest nor the money to bid $10 million or more in the entire hotel. Indeed, Clear has already successfully auctioned 11 of the Debtor's vehicles for several hundred thousand dollars—and none of these winning bidders are in the business of constructing hotels. Clear also had a company in the Philippines prepared to pay $1 million for much of the Debtor's personal property and even agreed to package and ship those items. (*See* ECF No. 51 at ¶ 24). This is precisely why the reasonable business decision is to have a separate

marketing and auction procedure for the Personal Property, the Causes of Action, and for the Hotel and Leasehold.

A separate sale of the Complete Personal Property and Causes of Action also permits a much faster sale of depreciating assets—which also maximizes value. Clear has already started the process of preparing the Debtor's vehicles for sale and has experience auctioning this asset. Similarly, Clear already has experience selling the Debtor's equipment as well as its liquor. Clear is therefore able to move quickly to sell these assets before they further depreciate. By contrast, it has become evident that running a fair, adequate process to sell the Hotel and Leasehold will require a longer, more thorough process that entails hiring professionals, valuing and assessing the asset, marketing the assets, providing due diligence opportunities, and a fair bidding schedule. This may take many months or even a year. There is no reason for Clear to lose its momentum and for these assets to further depreciate while this longer sales process for the Hotel takes place.

2. <u>A separate sale of the Complete Personal Property will avoid extensive, costly litigation over the amount paid for these assets as a proportion of the total sales prices.</u>

As referenced above, numerous parties have a security interest in the Complete Personal Property. Therefore, the proceeds from the sale of this asset will be divided differently than from the sale of the Hotel or Leasehold. Therefore, if these assets are all sold together as part of the Hotel sale, the Court will need to determine what percentage of the total sale was attributable to the Complete Personal Property. This process will require extensive litigation involving costly expert witnesses trying to reconstruct the percentage of the total price that the winning bidder placed on the Complete Personal Property. The process will drain resources from the parties and the Court, likely take many months (if not longer), and even then, will still produce only an imprecise result. Yet, this problem can be entirely avoided by marketing and auctioning the Complete Personal Property separately from the Hotel and Leasehold.

## IV. CONCLUSION

For the foregoing reasons, Gray respectfully requests that the Court deny the Motion.

Dated: August 30, 2024

                                            Respectfully submitted,

                                            __/s/_____
                                            Aaron Halegua
                                            Bruce Berline
                                            John-Patrick M. Fritz
                                            Attorneys for Judgment Creditor Gray