FILED
Clerk
District Court

NOV 2 5 2025

for the Northern Mariana Islands
By_____
(Deputy Clerk)

1  Jeffrey N. Pomerantz (*Pro hac vice* forthcoming)
   Jeffrey W. Dulberg (*Pro hac vice* forthcoming)
2  PACHULSKI STANG ZIEHL & JONES LLP
   10100 Santa Monica Blvd., 13ᵗʰ Floor
3  Los Angeles, CA 90067
   Telephone:   310/277-6910
4  Facsimile:   310/201-0760
   Email: jdulberg@pszjlaw.com
5

6  Attorneys for Intrepid Investment Bankers, LLC

7

8                 IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN MARIANA ISLANDS

10                        BANKRUPTCY DIVISION

11  In re:                                │ Case No. 1:24-bk-00002

12  IMPERIAL PACIFIC                      │ Chapter 11
    INTERNATIONAL (CNMI) LLC,
13                                        │ REPLY TO UNITED STATES TRUSTEE'S
                                          │ OBJECTION TO FIRST AND FINAL FEE
14          Debtor and Debtor in Possession. │ APPLICATION OF INTREPID
                                          │ INVESTMENT BANKERS LLC,
15                                        │ INVESTMENT BANKER TO THE
                                          │ OFFICIAL COMMITTEE OF GENERAL
16                                        │ UNSECURED CREDITORS, FOR
                                          │ ALLOWANCE OF COMPENSATION AND
17                                        │ REIMBURSEMENT OF EXPENSES FOR
                                          │ THE PERIOD FROM OCTOBER 1, 2024
18                                        │ THROUGH SEPTEMBER 30, 2025;
                                          │ DECLARATION OF CARL R. COMSTOCK
19                                        │ IN SUPPORT THEREOF

20                                        │ [Relates to Docket Nos. 483, 500, 503, and 504]

21                                        │ Hearing Date, Time and Location (ChST):
                                          │ Date:      December 5, 2025
22                                        │ Time:      9:00 a.m.
                                          │ Location:  3rd Floor Courtroom1671
23                                        │            Gualo Rai Rd., Gualo Rai
                                          │            Saipan, MP 96950
24
                                          │ Judge:     Hon. Robert J. Faris
25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

4926-1982-9884.3 42341.00001

Intrepid Investment Bankers, LLC ("**Intrepid**"), investment banker to the Official
Committee of Unsecured Creditors in the above-captioned case (the "**Committee**"), hereby files
this reply (the "**Reply**") and the Declaration of Carl R. Comstock (the "**Comstock Declaration**")
in support thereof, to the objection (the "**Objection**") [Docket No. 500] of the Office of the United
States Trustee (the "**OUST**"), the joinder to the Objection filed by Loi Lam Sit [Docket No. 503]
and the declaration of counsel to Imperial Pacific International (CNMI), LLC (the "**Debtor**") in
support of the Objection [Docket No. 504], to the First and Final Fee Application of Intrepid
Investment Bankers LLC, Investment Banker to the Official Committee of General Unsecured
Creditors, for Allowance of Compensation and Reimbursement of Expenses for the Period from
October 1, 2024 Through September 30, 2025 [Docket No. 483] (the "**Fee Application**").

I.

## INTRODUCTION

The Objection is ill-conceived both under prevailing bankruptcy law and principles of
equity. Intrepid skillfully performed its obligations under its retention agreement directly resulting
in a roughly 30% increase to the sale price achieved. Courts have repeatedly indicated that banker
fees are in the nature of a contingency fee (which is effectively what the Sale Fee was here) and
must not be considered under a lodestar standard which is only to be applied to attorneys' fees. If
honored, the OUST's Objection would serve to deter seasoned professionals from seeking future
retentions in this venue given the risk of minimization to their contractual, court-approved
retention terms, which is antithetical to the express goals of the chapter 11 process. It would be an
especially unsuitable result in this instance because unsecured creditors, represented by the
members of the Committee, are the only constituency that would be impacted were Intrepid's fees
to be reduced and they do not support any reduction to Intrepid's fees.

The Committee was put in a difficult situation in this case: the Debtor's process had
yielded only one bidder, and it was quickly evident that, despite limited estate resources, the
Committee had to lay the groundwork for a fulsome marketing process. Upon being contacted,
Intrepid immediately agreed, among other concessions, to *waive entirely* its standard monthly fees

and *to __eliminate__ its Sale Fee* in the event the initial bidder prevailed at his initial $10 million purchase price. The Committee retained Intrepid to maximize recoveries for stakeholders and the uncontested facts establish that Intrepid ran a robust process which yielded a substantially better result for creditors than they would have otherwise received. Rather than respect this outcome, the OUST objects to the Fee Application and seeks a roughly 90% reduction to Intrepid's sale fee.

After the Debtor's failed effort to sell to one bidder without a competitive auction process, the Committee insisted upon an auction process with procedures designed to create competitive tension. The outcome of the sale process shows that the Committee's choice to proceed with Intrepid – as opposed to allowing the Debtor to sell its assets for far less to the Debtor's initial bidder – was a wise one. Rather than simply accept the Debtor's contention that a sale for $10 million was the best course to follow, the Committee expressly contracted with Intrepid to lead a marketing process. It is undeniable that Intrepid did so, as the Comstock Declaration make clear.

Thus, the OUST has filed its objection despite the Fee Application being based on the terms of a Bankruptcy Court-approved retention agreement, the resulting sale and auction process having indubitably benefited the bankruptcy estate, and the only affected constituency's representative – the Committee – coming out against the Objection. *See* Declaration of Michael Salzman, Committee chairperson, filed concurrently herewith. At bottom, the OUST makes what amounts to a flawed argument. A section 330 objection typically takes the position that compensation for particular work undertaken by the hypothetical professional was unreasonable because it was unnecessary, duplicative or unlikely to yield a benefit to the estate. *See In re Mednet*, 251 B.R. 103 (B.A.P. 9th Cir. 2000). Here, however, the Objection's complaints are tenuous, consisting only of that the prevailing bidder first contacted Intrepid (rather than the other way around), and that Intrepid did not record enough hours in its timesheets to justify the Sale Fee on a lodestar basis. These fragile arguments can easily be shown to hold no water for the following reasons:

(1) The "Team King contacted the estate first" argument is a red herring. One of the benefits of a retaining an investment banker and the public nature of a bankruptcy sale process is

that it encourages "inbound" interest from potential buyers. Moreover, the "provenance" of the winning bidder was an issue that the parties obviously considered (see, for example, the carve-outs to the Sale Fee for the initial bidder and Keen Summitt-generated bidders) yet did not alter with respect to any other bidders and bankruptcy courts have rejected the notion that bankers are to be evaluated over such matters; and

(2) The "Intrepid *only* billed X hours" argument is a specious analysis. Indeed, the OUST readily acknowledges that: (a) Intrepid led a fulsome sale process including conducting the auction that led to a 30% increase (i.e., nearly $3 million) in the sale price and (b) Intrepid's retention terms unequivocally provide that Intrepid shall earn a Sale Fee of $1 million upon the closing of a sale to an overbidder that results in "Aggregate Consideration" to the estate of between $10,000,001 and $15,000,000. With nothing else to point to, the OUST attempts to apply a lodestar analysis to Intrepid's work as if that were the appropriate standard for measuring the reasonableness of a banker's fee which it most assuredly is not. Indeed, bankruptcy courts have firmly rejected attempts to use lodestar analysis – designed for attorney's fees – to measure the reasonableness of a banker's fee.

On the contrary, all the actions taken by Intrepid in this case were reasonable when properly viewed from the perspective of the time at which they were made as required by bankruptcy case law interpreting section 330 of the Bankruptcy Code. The facts show that after the Debtor's failed effort to sell to one bidder without a competitive auction process, the Committee contended that the Debtor establish a customary marketing and sale process. Despite the lack of cooperation from the Debtor at various points, there was a competitive auction dynamic that ultimately resulted in a sale that was for 30% more than the original bid.

For all these reasons, the OUST's Objection must be overruled and the Fee Application approved.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**II.**

**FACTUAL BACKGROUND**

**A.    The Case, The Sit Stalking Horse, and the Committee's Retention Of Intrepid**

On April 19, 2024, the Debtor commenced this chapter 11 case.

On August 10, 2024, the Debtor filed its motion to approve bid procedures for the sale of substantially all of its assets, proposing a competitive bidding process with a stalking horse bid of $10,000,000 from Loi Lam Sit ("**Sit**"), a $200,000 break-up fee, a $300,000 minimum initial overbid, and $100,000 bid increments (Docket No. 182). The assets initially proposed to be sold excluded, among other things, the Debtor's casino license and any gaming receivables.

On September 23, 2024, the Committee filed its application to employ Intrepid as its investment banker pursuant to 11 U.S.C. §§ 328 and 1103. The Engagement Agreement, attached to that application, provided for:

- a nonrefundable earned-upon-receipt initial fee of $50,000;

- hourly compensation based on Intrepid's customary investment banking rates; and

- a nonrefundable "Sale Fee" payable upon consummation of any qualifying sale, structured as a tiered fee grid keyed to "Aggregate Consideration," including a $1,000,000 Sale Fee where Aggregate Consideration is between $10,000,001 and $15,000,000.

The Engagement Agreement expressly addressed the proposed Sit stalking horse bid and the separate proposed engagement of Keen-Summit Capital Partners LLC ("**Keen-Summit**") as the Debtor's real estate broker. Among other things, Intrepid made concessions and agreed that:

- it would not receive any Sale Fee if a sale closed with Sit at the $10,000,000 stalking horse price; and

- if a sale closed with a third party that was solicited or introduced by Keen-Summit, Intrepid's Sale Fee would be capped at $250,000.

On October 5, 2024, following an extended hearing featuring commentary from the OUST and various creditor constituencies, the Court entered its order approving Intrepid's employment (the "**Employment Order**"), authorizing the Committee to employ Intrepid "pursuant to 11 U.S.C. §§ 328 and 1103" and approving the Engagement Agreement's compensation structure,

1  subject to a negotiated reservation of the OUST's rights to raise reasonableness objections at the

2  fee-application stage.

3  **B.    Intrepid's Marketing and Sale Efforts and the Resulting Auction**

4         After entry of the Employment Order, Intrepid undertook the tasks described in the Fee

5  Application, including:

6         o    developing marketing materials and a data room for the Debtor's assets;

7         o    contacting nearly 100 potentially interested parties

8         o    securing seven executed non-disclosure agreements and providing those parties
             with confidential information; and

9
         o    coordinating the marketing and sale process in conjunction with the Committee and
10            its advisors.

11        Intrepid's efforts culminated in an auction at which two qualified bidders participated and

12  Team King, a qualified overbidder, submitted the winning bid of $12,950,000, representing a

13  roughly 30% increase over the original $10,000,000 proposed stalking horse bid, together with the

14  assumption of certain liabilities and an option structure relating to the casino license, as set forth in

15  the Fee Application and the sale record.

16        Intrepid recorded 193.45 hours of work during the application period, at a blended hourly

17  rate of approximately $541.70, for total hourly fees of $104,792.50, in addition to the previously

18  paid $50,000 initial fee and $5,243.99 in expenses. The Fee Application therefore requests

19  allowance of the $50,000 initial fee; $104,792.50 in hourly fees; a $1,000,000 Sale Fee (triggered

20  by Aggregate Consideration between $10,000,001 and $15,000,000); and $5,243.99 in expenses,

21  for total compensation and reimbursement of $1,160,036.49, of which $1,110,036.49 remains

22  unpaid.

23  **C.    The OUST's Objection**

24        The OUST's Objection does **not** challenge the propriety of Intrepid's retention, the

25  appropriateness of establishing competitive bidding procedures and holding an auction, the

26  validity of the sale to the overbidder, or the fact that the sale price increased by nearly $3 million

27  over the originally proposed Sit stalking horse bid.  Instead, the OUST focuses on one issue: it

28

1  asserts that Intrepid did not "find" either of the two auction participants and therefore should not

2  be entitled to the $1,000,000 Sale Fee, but only to its hourly fees and expenses. It characterizes the

3  requested compensation as translating into an "effective hourly rate" of approximately $5,969 and

4  argues that such a rate is *per se* unreasonable.

5        As discussed below, that is not the law, and it is an unfair and wrongful characterization of

6  the bargain that was struck, disclosed to the Court, approved under section 328, and fully

7  complied with by the Committee and Intrepid.

8  **III.**

9  **LEGAL STANDARDS**

10  **A.    Sections 328 and 330 Serve Different Functions**

11        Section 328(a) provides that, with court approval, an estate may employ professionals "on

12  any reasonable terms and conditions of employment, including on a retainer, on an hourly basis,

13  on a fixed or percentage fee basis, or on a contingent fee basis," and that such pre-approved terms

14  may later be modified only "if such terms and conditions prove to have been improvident in light

15  of developments not capable of being anticipated at the time of the fixing of such terms and

16  conditions." 11 U.S.C. § 328(a).

17        The Ninth Circuit has held that where a professional's retention is unambiguously

18  approved under section 328(a), the court may not, at the fee application stage, revisit the

19  reasonableness of the pre-approved terms except under that "improvident" standard. *Circle K*

20  *Corp. v. Houlihan, Lokey, Howard & Zukin, Inc. (In re Circle K Corp.)*, 279 F.3d 669, 671–72

21  (9th Cir. 2002).  If a retention is not clearly approved under section 328(a), then compensation is

22  reviewed under section 330's "reasonable compensation for actual, necessary services" standard.

23  Id. at 671.

24        Here, the Committee's retention application expressly invoked section 328, and the

25  Employment Order explicitly approved the retention "pursuant to 11 U.S.C. §§ 328 and 1103,"

26  adopting the Engagement Agreement's fee grid. The negotiated reservation of the OUST's right to

27  raise section 330 issues does not transform the engagement into a pure lodestar arrangement or

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  erase the prior judicial determination that the fee structure was reasonable when approved. It

2  simply preserves the OUST's opportunity to argue unreasonableness; it does not guarantee that

3  argument will prevail in the face of the Court's concurrent section 328 approval and the actual

4  outcome.

5  **B.**  **Section 330's Focus: Ex Ante Benefit and Reasonableness, Not Hindsight Discomfort**

6      To the extent section 330(a) is applicable, it authorizes "reasonable compensation for

7  actual, necessary services," based upon: "the nature, the extent, and the value of such services;"

8  and "all relevant factors," including time spent, rates charged, necessity and benefit "at the time at

9  which the service was rendered," efficiency, the professional's skill and experience, and

10  customary compensation outside bankruptcy. 11 U.S.C. § 330(a)(1), (3).

11      The Ninth Circuit BAP in *Mednet* held that services are compensable if they "were

12  reasonably likely to benefit the debtor's estate" or were "necessary to the administration of the

13  case" at the time they were rendered. *In re Mednet*, 251 B.R. 103, 108 (B.A.P. 9th Cir. 2000).

14  The Ninth Circuit also recognizes that while courts often employ the "lodestar" method

15  (reasonable hours × reasonable rate), the lodestar is a flexible tool, and the core inquiry remains

16  whether the services and compensation are reasonable under the circumstances. See *In re Manoa*

17  *Fin. Co., Inc.*, 853 F.2d 687, 691–92 (9th Cir. 1988); *Unsecured Creditors' Comm. v. Puget Sound*

18  *Plywood, Inc.*, 924 F.2d 955, 959–61 (9th Cir. 1991).

19  **C.**  **Success Fees and Contingent / Percentage-Based Compensation Are Expressly**
20         **Authorized**

21      Section 328(a) explicitly contemplates compensation "on a fixed or percentage fee basis,

22  or on a contingent fee basis." 11 U.S.C. § 328(a).  Bankruptcy courts routinely approve success

23  fees and transaction-based compensation for investment bankers and financial advisors,

24  particularly where those terms are disclosed and approved at the outset under section 328(a). *See,*

25  *e.g., In re NephroGenex, Inc.*, Case No. 16-11074 (KG), 2017 WL 3189861, at *3–4 (Bankr. D.

26  Del. July 26, 2017) (enforcing investment banker success fee approved under section 328(a) over

27  later objections); and *In re Garces Rest. Grp., Inc.*, 2019 WL 2743581, at *7–8 (Bankr. D.N.J.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  June 28, 2019) (surveying market comparables and approving transaction fee structure for

2  investment banker).

3       Attempts to recharacterize such success fees as "unreasonable" after the fact simply

4  because they produce a high "effective hourly rate" conflict with both the text of section 328(a)

5  and the market realities that Congress expressly endorsed when it allowed percentage and

6  contingent arrangements.

7                                                        **IV.**

8                                                  **ARGUMENT**

9  A.    **The Court's Prior Section 328 Approval and the Engagement Agreement's Term**
        **Strongly Support allowance of the Sale Fee**

10

11      There is no dispute that the Committee's retention application expressly invoked section

12  328, the Employment Order expressly approved the retention "pursuant to 11 U.S.C. §§ 328 and

13  1103"; and the Employment Order adopted the Engagement Agreement's fee grid, including a

14  $1,000,000 Sale Fee for Aggregate Consideration between $10,000,001 and $15,000,000.

15  The Engagement Agreement was negotiated with full awareness that a proposed $10,000,000 Sit

16  stalking horse bid already existed, and Intrepid's value proposition was to design, coordinate, and

17  run a competitive sale process on behalf of the estate, not to act as an exclusive "finder" of a

18  buyer.  Consistent with that understanding, the Engagement Agreement denies Intrepid any Sale

19  Fee if the sale closed with Sit at $10,000,000 and caps Intrepid's Sale Fee at $250,000 if the

20  successful buyer were "solicited or introduced" by Keen-Summit.

21      What the Engagement Agreement does **not** do is condition Intrepid's Sale Fee on Intrepid

22  being the "procuring cause" of the winning bidder in every other scenario. That was a deliberate

23  choice. The parties understood that Intrepid's principal role was to create and manage a robust

24  process, and that value could be realized even if a sophisticated third party independently surfaced

25  and joined the process.

26      Under Circle K, an application and order that explicitly invoke section 328 and approve

27  specific compensation terms "lock in" those terms, subject only to the "improvident in light of

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

developments not capable of being anticipated" safety valve. 279 F.3d at 671–72. There has been no such development here. The result that occurred – a competitive auction yielding a sale at $12,950,000, almost 30% higher than the originally proposed stalking horse bid – is precisely the improved outcome the fee grid was built to incentivize.

The OUST's attempt to effectively rewrite the Engagement Agreement so that Intrepid is only paid hourly, and never a Sale Fee, whenever it cannot be shown that Intrepid "found" the winning bidder, is contrary to the contract, to the Court's prior section 328 approval, and to Ninth Circuit law.

**B.     Even Under Section 330, the Requested Sale Fee is Reasonable Under the Statutory Factors**

Even assuming, arguendo, that the Court were to approach the Fee Application primarily under section 330, the result is the same: Intrepid's compensation is reasonable when measured against the statute and controlling precedent and appropriate.

1.     Intrepid's services were necessary, non-duplicative, and efficiently performed.

The services described in the Fee Application fall squarely within the mandate for which Intrepid was retained:

- analyzing the Debtor's assets and capital structure;

- preparing marketing materials and a data room;

- identifying and contacting nearly 100 potential counterparties;

- coordinating diligence and communications with interested parties;

- advising the Committee (and the Debtor) in negotiations regarding bid procedures and sale structure; and

- running the auction and assisting in selection of the successful bidder and back-up bidder.

These services were not duplicated by other professionals. Keen-Summit's retention application was rejected; Intrepid's role, as the Committee's investment banker, was to design and run a holistic sale process from the creditors' perspective (while also cooperating with and assisting the Debtor as Intrepid was the only investment banker retained in the case). The OUST

1  does not argue that any particular category of services was unnecessary or wasteful; its focus is
2  solely on the overall dollar amount of the Sale Fee.

3      Under section 330(a)(3)(C)–(E), a court considers whether services were necessary or
4  beneficial at the time rendered, and whether they were performed within a reasonable time frame
5  given the complexity and importance of the issues. Here, a constrained timeline, a complex
6  regulatory and operational environment, and a distressed gaming asset in a geographically remote
7  jurisdiction all underscore that the Committee's decision to retain a specialist investment banker
8  was reasonable and appropriate.

9      2.    The Results Obtained Strongly Support the Requested Compensation

10      The Objection itself acknowledges that the sale outcome was materially better than the pre-
11  existing Sit deal: an auction was held, and the winning bid was approximately $12,950,000 rather
12  than $10,000,000, with additional structural features that benefited the estate. Under *Mednet* and
13  *Puget Sound Plywood*, courts in the Ninth Circuit must consider both the likely and actual benefit
14  to the estate when assessing fee reasonableness. *Mednet*, 251 B.R. at 108; *Puget Sound Plywood*,
15  924 F.2d at 959–61.  Here, the gross cash purchase price increased by nearly $3,000,000, the
16  bidding process validated market interest in the assets and produced a competitive dynamic that
17  likely improved terms beyond merely price; and unsecured creditors' prospects for recovery
18  improved substantially compared to a proposed baseline $10,000,000 stalking-horse transaction.

19      In a world where the estate could have been liquidated around a proposed $10,000,000
20  stalking-horse deal or worse, the Committee's strategy – retaining Intrepid and insisting on a
21  proper auction – delivered exactly the sort of incremental value that bankruptcy investment
22  bankers are engaged to produce.  Measured against that benefit, a $1,000,000 Sale Fee is a modest
23  percentage of transaction value and aligns with market norms for distressed middle-market
24  transactions. Courts evaluating similar success fees have accepted such percentages as reasonable
25  under section 330 where the engagement produced substantial value. See *NephroGenex*, 2017 WL
26  3189861, at *3–4; Garces, 2019 WL 2743581, at *7–8.

27
28

1    Indeed, as noted in the Comstock Declaration, Intrepid itself has recently completed

2  engagements resulting in similarly sized awards in two cases with remarkably similar fact patterns

3  to the instant case, *In re Zymergen Inc.*, No. 23-11661 (KBO) (Bankr. D. Del. Oct. 3, 2023) and *In*

4  *re Nuvo Group USA Inc.*, No. 24-11880 (MFW) (Bankr. D. Del. Aug. 22, 2024).

5    (1) In *Zymergen*, the winning bid was comprised of two combined bids for a total of

6  $8,600,000. Intrepid's total fee consisted of $1,650,000 (i.e., a sale fee of $1,250,000 plus

7  $400,000 of monthly fees). One of the winning bids came from an insider, just as it did in the

8  matter presently before the Court.

9    (2) In *Nuvo Group*, the winning bid was approximately $13.4 million made up of $10.2

10  million in cash with the remainder assumed cure costs and liabilities. Intrepid's total fee consisted

11  of $1,550,000 (i.e., a sale fee of $1,250,000 plus $300,000 of monthly fees). The winning bidder

12  was an insider (i.e. not a party Intrepid initially contacted) and there were no other bidders at the

13  auction.

14    In each of the *Zymergen* and *Nuvo Group* cases, Intrepid devised and conducted a robust

15  process and were awarded fees accordingly, irrespective of the provenance of the winning bidders.

16  The fees awarded in those cases are very much in line with those contracted for and requested in

17  the present case. There is no appreciable difference between these two recent situations and the

18  case at issue.

19    3.    The OUST's "Intrepid did not find the bidders" Argument Misreads Both the
        Contract and the Role of an Investment Banker

20

21    The OUST repeatedly emphasizes that the two parties who ultimately bid at the auction

22  came into the case "independent of Intrepid's search for bidders," and from that premise asserts

23  that Intrepid "accomplished little" and should not receive a Sale Fee.  That argument fails on

24  several levels:

25    (a)    **Contractual text**: As noted above, the Engagement Agreement explicitly

26  addresses the scenario where Keen-Summit (if both firms had been retained), not Intrepid,

27  produces the buyer and caps Intrepid's Sale Fee in that specific instance; it does not otherwise

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   condition the Sale Fee on Intrepid being the procuring cause of the winning bidder. The OUST's

2   position reads into the contract a condition that the parties clearly chose not to adopt.

3         (b)    **Economic reality**: In chapter 11 practice, investment bankers are typically

4   engaged to design and run processes, not to function as "finders" in the narrow sense. A

5   sophisticated buyer that learns of the opportunity from other sources – one of the benefits of the

6   public nature of a bankruptcy sale process – but chooses to participate in a Court-supervised

7   process shaped and run by the banker, is still responding to the framework that the banker has

8   helped create.

9         (c)    **Causation in context**: The fact that a particular bidder-initiated contact

10  with Intrepid (or with others) does not mean Intrepid's work did not contribute to the ultimate

11  bidding dynamic or the final price. Intrepid's outreach to nearly 100 parties, its management of

12  diligence, and its coordination of the auction all contributed to the atmosphere in which bidders

13  were compelled to "sharpen their pencils."

14      Under section 330, the test is not whether the professional can prove, to a metaphysical

15  certainty, that each dollar of recoveries would not exist "but for" its efforts. The test is whether the

16  services were reasonably likely to benefit the estate when undertaken and whether they, in fact,

17  helped produce a beneficial outcome. *Mednet*, 251 B.R. at 108. That standard is indisputably

18  satisfied here.

19      4.    The "Effective Hourly Rate" Critique is Legally Irrelevant to a Section 328

20  /Success Fee Structure and Overstated Under Section 330

    The OUST's principal rhetorical device is to divide Intrepid's total requested

21  compensation by its recorded 193.45 hours, yielding a blended "effective" rate of approximately

22  $5,969 per hour, and to label that figure "beyond excessive." There are several problems with that

23  effort:

24      (a)    **In a Section 328 / success-fee context, "effective hourly rates" are**

25  **inherently misleading.**

26      Congress explicitly authorized percentage and contingent-fee arrangements in section

27  328(a). If such arrangements are pre-approved, courts cannot later reduce the fee merely because,

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

in hindsight, the implied hourly rate looks high. Circle K, 279 F.3d at 671–72. Because transaction
fees are contingent upon the consummation of a transaction, some "factors do not apply, such as
time spent or the rates charged." *In re XO Communs., Inc.*, 398 B.R. 106, 113 (Bankr. S.D.N.Y.
2008) (quoting *In re Intelogic Trace, Inc.*, 188 B.R. 557, 559 (Bankr. W.D. Tex. 1995)) (footnote
omitted) (internal quotation marks omitted). *See also In re Iron Horse Bicycle Co.*, 2010 Bankr.
LEXIS 378, 2010 WL 474560, at *7 (Bankr. E.D.N.Y. 2010) ("[R]easonableness of a chapter 11
professional's fee need not always consider hours worked or billing rates.")

      (b)    **Even under Section 330, lodestar is a tool, not a hard cap.**

*Manoa* and *Puget Sound Plywood* make clear that the lodestar may be adjusted in light of
factors such as results obtained, risk undertaken, and marketplace compensation for similar work.
*See Manoa* at 691–92; *Puget Sound Plywood* at 959–61. Under the OUST's view, Intrepid's
services, delivered at a discount to market rates given the waiver of standard monthly fees
(typically $75,000 per month or more), are to be measured solely by the number of hours spent as
if this were accepted practice for evaluating investment bankers.

      (c)    **The OUST provides no market evidence.**

Bankruptcy courts that scrutinize success fees under section 330 frequently look to what
investment bankers are paid in comparable transactions. *Garces*, 2019 WL 2743581, at *7–8. The
Objection includes no data suggesting that a $1,000,000 fee on a $12.95 million sale is outside
market norms for this type of asset and jurisdiction. On the contrary, as reflected by the *Zymergen*
and *Nuvo Group* outcomes (and as supported by the *Garces* opinion), Intrepid has offered
evidence reflecting the OUST is seeking an abnormal result.

      (d)    **Results matter**.

Even in the civil-rights fee-shifting context, where the Supreme Court treats the lodestar as
a "starting point," courts recognize that "the extent of a plaintiff's success is a crucial factor" in
determining the proper fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). Bankruptcy
courts applying section 330 similarly emphasize success as "powerfully relevant" to fee

1  determinations. Here, the Committee and Intrepid succeeded in materially improving the sale

2  outcome versus the baseline.

3      In short, the OUST's "effective hourly rate" critique ignores the statutory framework, the

4  market, and the case-specific results.

5  **C.    The OUST's Policy Concerns Do Not Justify Re-Trading A Court-Approved Bargain**

6      The OUST is charged with monitoring professional compensation. 28 U.S.C. § 586(a)(3).

7  That role is important. But it does not permit the OUST to rewrite arm's-length, Court-approved

8  engagement terms after the fact, especially where the engagement was expressly approved under

9  section 328, the triggering conditions for the success fee have been met exactly as contemplated,

10  the estate has clearly benefitted from the transaction; and the constituency whose interests were

11  directly at stake (the Committee) supports the Fee Application.  Nor has the OUST pointed to any

12  "development not capable of being anticipated at the time" of Intrepid's retention that would

13  justify modifying the terms under section 328(a). The existence of a $10,000,000 stalking-horse

14  bid, the uncertainty of bidder interest, and the risk that few or no additional bidders would surface

15  were all known and disclosed. What actually occurred – a competitive auction and a significantly

16  improved sale price – is exactly the sort of outcome the Engagement Agreement anticipated.

17      As courts addressing investment banker success fees have observed, undermining section

18  328-approved arrangements after the fact chills professionals' willingness to undertake risk on

19  reasonable terms and ultimately harms estates and creditors. *NephroGenex*, 2017 WL 3189861, at

20  *3–4. If an investment banker cannot rely on Court-approved success fee terms being honored

21  when the deal succeeds, it will naturally demand higher retainers, higher monthly fees, and less

22  contingent compensation, to the detriment of distressed estates that can least afford it.

23                              **V.**

24                          **CONCLUSION**

25      Intrepid did exactly what the Committee retained it to do: design and run a sale process

26  that maximized value for unsecured creditors. The result is undisputed: an auction that generated a

27  winning bid of $12,950,000, approximately 30% higher than the previously proposed $10,000,000

28

stalking horse, plus additional structuring benefits. The fee structure under which Intrepid now seeks compensation was negotiated at arm's length, fully disclosed approved by this Court under section 328 and section 1103; and explicitly drafted to provide for a $1,000,000 Sale Fee in the exact circumstance that occurred.

The OUST's Objection offers no basis in section 328, section 330, or Ninth Circuit precedent to disregard that structure or to deny Intrepid the Sale Fee that all parties contemplated from the outset. For the foregoing reasons, Intrepid respectfully requests that the Court:

1.      Overrule the Objection;

2.      Approve the Fee Application in full, including allowance of the $1,000,000 Sale Fee and reimbursement of expenses as requested; and

3.      Grant such other and further relief as the Court deems just and proper.

Dated: November 25, 2025                 PACHULSKI STANG ZIEHL & JONES LLP


By: /s/ Jeffrey W. Dulberg
    Jeffrey N. Pomerantz
    Jeffrey W. Dulberg

    Attorneys for Intrepid Investment Bankers, LLC

## DECLARATION OF CARL R. COMSTOCK

I, Carl R. Comstock, declare that:

1.     I am a Director at Intrepid Investment Bankers LLC ("**Intrepid**"), an investment bank that employs approximately 100 investment bankers and maintains an office for the practice of investment banking at 1221 Avenue of the Americas, 9th Floor, New York, NY 10020, as well as offices in Los Angeles, CA, San Francisco, CA, Chicago, IL, and Charlotte, NC.

2.     Intrepid is an investment bank that provides M&A advisory, buy-side target search, capital advisory, and special situations advisory services to entrepreneur and family-owned companies, private equity sponsors, and major corporations, through dedicated teams with over four decades of deep industry sector experience. Intrepid is the advisory arm of Mitsubishi UFJ Financial Group, one of the largest financial organizations in the world. Intrepid is headquartered in Los Angeles, California, with offices in New York, Chicago, Charlotte, and San Francisco.

3.     Intrepid has a dedicated restructuring investment banking group with extensive experience advising corporations, creditors' committees and other constituents in complex situations involving underperforming or unsuitably capitalized businesses facing difficult financing conditions, liquidity crises, out of court restructurings, and bankruptcy proceedings.

4.     Intrepid has been involved as advisors with respect to financial restructurings, raising of capital, mergers, acquisitions, divestitures and other advisory assignments. Its financial restructuring professionals apply expert technical, analytical and negotiating skills to structure transactions and resolve situations in which multiple stakeholders frequently have conflicting interests and objectives. Its senior level professionals provide hands-on advice throughout the process from the initial planning of the restructuring strategy through the negotiation and execution of each transaction.

5.     Intrepid professionals have been involved with several significant bankruptcy proceedings, representing both debtors and other constituencies. Intrepid professionals have significant experience in marketing distressed businesses and have consummated numerous distressed sales transactions, including those pursuant to Bankruptcy Code Section 363.

6.    Intrepid's professionals have served as investment bankers and financial advisors in numerous chapter 11 cases, including but not limited to: *In re Amyris, Inc.*, No. 23-11131 (Bankr. D. Del. Aug. 9, 2023); *In re Tritek Int'l Inc.*, No. 23-10520 (TMH) (Bankr. D. Del. June 8, 2023); *In re Watsonville Hosp. Corp.*, No. 21-51477 (Bankr. N.D. Cal. Dec. 5, 2021); *In re Aluminum Shapes*, LLC, No. 21-16520 (JNP) (Bankr. D.N.J. Oct. 8, 2021); *In re Garrett Motion Inc.*, No. 20-12212 (Bankr. S.D.N.Y. Feb. 5, 2021); *In re Carla's Pasta, Inc.*, No. 21-20111 (Bankr. D. Conn. Mar. 22, 2021); *In re Mishti Holdings, LLC*, No. 19-11813 (CSS) (Bankr. D. Del. Dec. 16, 2019); *In re Sienna Biopharmaceuticals, Inc.*, No. 19-12051 (MFW) (Bankr. D. Del. Oct. 15, 2019); *In re Zymergen Inc.*, No. 23-11661 (KBO) (Bankr. D. Del. Oct. 3, 2023); and *In re Nuvo Group USA Inc.*, No. 24-11880 (MFW) (Bankr. D. Del. Aug. 22, 2024).  Accordingly, Intrepid and the professionals it employs are well qualified to represent the Committee in the matters for which Intrepid is proposed to be employed.

7.    I am fully familiar with the facts hereinafter stated, and I am authorized to and hereby make this declaration on behalf of Intrepid.  The information contained in this Declaration is of my personal knowledge or is derived from discussions with my partners or my review of the files in this case.

8.    Intrepid is the investment banker to the Committee (and de facto investment banker to the Debtor as no other investment banker or broker was retained).  I submit this Declaration in support of the Reply to United States Trustee's Objection to First and Final Fee Application of Intrepid Investment Bankers LLC, Investment Banker to The Official Committee of General Unsecured Creditors, for Allowance of Compensation and Reimbursement of Expenses (the "**Reply**").[1]

9.    Intrepid was first contacted by Arent Fox Schiff ("**AFS**"), counsel to the Committee, regarding the opportunity to submit a proposal to serve on behalf of the Committee as investment banker. AFS provided background on the case and indicated that while an offer had been received for the Assets of the estate, the $10,000,000 offer from Mr. Sit, it was not

---

[1] Capitalized terms not defined herein shall have the same meaning ascribed to them in the Reply.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    acceptable to the Committee and certain other stakeholders and it was the Committee's desire that

2    an investment banker be retained to run a fulsome marketing process.

3        10.    Intrepid prepared pitch materials that highlighted its qualifications marketing

4    challenging and / or distressed assets to potential buyers on a global scale. Following the

5    preparation of these materials, Intrepid was asked to prepare a fee proposal and then to prepare the

6    related retention application to be heard by the Bankruptcy Court. Intrepid's proposal (and related

7    retention application) was heavily negotiated and Intrepid agreed to make two concessions to its

8    otherwise market-standard fee structure. First, understanding that the Debtor was operating with

9    limited financial resources, Intrepid agreed to waive its standard monthly fee which was typically

10   paid on a monthly basis and, instead to charge on an hourly basis. While Intrepid does not

11   maintain the same timekeeping software or standards as legal professionals, it agreed to keep time

12   in 0.25 increments. Second, Intrepid agreed that should Mr. Sit's original bid of $10,000,000

13   ultimately be approved, Intrepid would agree to a fee reduction from its Sale Fee rates. Despite an

14   objection from the Debtor which wished to retain a real estate broker, Intrepid's retention was

15   ultimately approved following an extended hearing and commentary and input from a number of

16   parties including the United States Trustee.

17       11.    Following Intrepid's retention, Intrepid immediately began developing marketing

18   materials and setting up a virtual data room.  The online data room included hundreds of files

19   covering the following diligence areas: Construction Plan, Financials, Floorplans, Insurance,

20   Leases, Permits, Photos and Videos of the Property, and Title Reports. Considering the Debtor's

21   potential in the casino and hospitality industry, the virtual data room provided comprehensive

22   information primarily related to the Debtor's casino asset, including detailed information on the

23   casino hotel building, the leasehold interest in the land lease with the Department of Public Lands

24   (the "DPL"), and an analysis of the Saipan market. Despite limited employee resources for the

25   Debtor, Intrepid attempted to work with the Debtor and Debtors professionals to obtain all

26   available information and respond to additional data requests from prospective purchasers.'

27       12.    In order to maximize value to the estate, Intrepid contacted approximately 100

28   potentially interested parties including casino operations, hospitality companies, financial

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

investors, and parties interested in a subset of the assets (should a "sum-of-the-parts" sale structure become the most value enhancing structure available). Intrepid held initial diligence calls with many of these parties and proceeded to execute NDAs and provide dataroom access with any parties who were interested in progressing further in the sale process.

13.    During the marketing process, Intrepid became aware that there were numerous parties that were interested in a subset of the assets including certain fixed assets and inventory of the Debtor, but most notably, in approximately $1.2 billion of gambling receivables. Intrepid engaged with multiple parties interested in these receivables, including litigation finance companies and debt collection agencies, and ultimately received one initial offer in November 2024 that would have provided an upfront fixed payment to the estate as well as a percentage of any debts recovered.

14.    This offer was contingent on receiving the necessary information from the Debtor to identify the holders of these receivables and determine they were factually accurate. Intrepid attempted to engage with Debtor's counsel and the Debtor to obtain this information as this offer could have provided a windfall for the estate. As part of these discussions, Intrepid was informed by Debtor's counsel that "The receivables were never part of the proposed sale to Mr. Sit." Despite repeated efforts, Intrepid was never able to obtain any information from the Debtor regarding these receivables.

15.    Following the discussions around these receivables, in January 2025, Mr. Sit elected to submit a revised bid which now included as an Acquired Asset "all accounts or notes receivable held by Sellers, and any security, claim, remedy or other right related to any of the foregoing" and increased the purchase price to $12,500,000. This bid was ultimately determined to be acceptable by the Debtor and the Committee and was designated as the stalking horse bid.

16.    Intrepid continued to market the Assets and ahead of the qualifying bid deadline, Intrepid received one additional bid from Team King that was substantially similar to the bid from Mr. Sit but offered $12,950,000. Following review of this bid, including verifying financial wherewithal with Team King's financial sources, this bid was determined to be a qualifying bid.

17.     Ahead of the auction, two other bids were received for subsets of the assets. One bid for certain fixed assets and a revised offer for the receivables. The bid for the receivables had been restructured given the lack of information provided but still would provide for a fixed payment upfront as well as a percentage of recoveries up to a cap. Intrepid worked with Debtor's counsel to determine if either bidder would be willing to modify its bid and carve out the assets being sought under the partial asset bids so that recoveries to the estate could be increased. Unfortunately, neither bidder was willing to make an accommodation for these assets and the two partial asset bidders were not provided the opportunity to bid at auction.

18.     The auction was set for February 26, 2025 (ChST) and ahead of the auction, Intrepid provided guidance to both Mr. Sit and Team King regarding the rules and conduct of the auction. Intrepid, the Debtor, and the other constituents believed the competitive dynamic had been established through Intrepid's fulsome marketing process and more than 20 people gathered virtually to view the auction.

19.     Once the auction began, Mr. Sit was the first bidder as Team King had submitted an overbid. Mr. Sit's counsel then stated that Mr. Sit would not be bidding further and provided the following explanation: *"Yes, thank you. So, I guess I wanted to make a statement that Mr. Sit had intended in engaging and overbidding. But we've decided not to based on communications that we've received both directly from CNMI and through the Debtors Council, that the conditions that we had to closing were not agreeable and would not be agreeable and that certain bonds were required under the lease, which we disagree with. So, Mr. Sit will not be making an overbid."*

20.     With no bid from Mr. Sit, Team King was declared the Successful Bidder and then worked over the following months to close on the transaction.

21.     While the conduct of CNMI's representatives and the resulting outcome of the auction were disappointing following the competitive tension fostered by Intrepid, the sale process accomplished the goals that were initially set out when Intrepid was engaged. A fulsome, professional marketing process was run over the course of five months and proceeds to the estate were increased by approximately thirty percent (30%).

22.    In addition, Intrepid itself has recently completed engagements resulting in similarly sized awards in two cases with remarkably similar fact patterns to the instant case, *In re Zymergen Inc.*, No. 23-11661 (KBO) (Bankr. D. Del. Oct. 3, 2023 and *In re Nuvo Group USA Inc.*, No. 24-11880 (MFW) (Bankr. D. Del. Aug. 22, 2024).

23.    In *Zymergen,* the winning bid totaled $8,600,000 comprising two combined bids. Intrepid's total fee consisted of $1,650,000 (i.e., a sale fee of $1,250,000 plus $400,000 of monthly fees). The winning bidders included insiders and, as with the instant case, the winning bidders did not include any party that was not already familiar with the assets (the non-insider bidder was a customer of the debtor).

24.    In *Nuvo Group*, the winning bid was approximately $13.4 million made up of $10.2 million in cash, with the remainder assumed cure costs and liabilities. Intrepid's total fee consisted of $1,550,000 (i.e., a sale fee of $1,250,000 plus $300,000 of monthly fees). The winning bidder was an insider (i.e. not a party Intrepid initially contacted) and there were no other bidders at the auction.

25.    In each of the *Zymergen* and *Nuvo Group* cases, Intrepid devised and conducted a robust process and were awarded fees accordingly, irrespective of the provenance of the winning bidders. The fees awarded in those cases are very much in line with those contracted for and requested in the present case. There is no appreciable difference between these two recent situations and the case at issue.

26.    In summary, Intrepid ran an effective marketing process that resulted in a Sale (as defined in Intrepid's engagement agreement and Retention Application) and the previously negotiated and approved, market-standard fee structure is reasonable and Intrepid's First and Final Fee Application should be approved over any objections raised.

1    Executed this 25th day of November, 2025 at New York, New York.

2

3                                          *Carl Comstock*

4                                          Carl Comstock

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

7

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on November 25, 2025, I caused the forgoing documents to be filed

3    with the Clerk of Court for the United States District Court for the Northern Mariana Islands,

4    Bankruptcy Division, using the CM/ECF System. A true and correct copy of the said pleadings

5    and all attachments thereto have been served on all counsel of record via the Court's CM/ECF

6    System.

7      Executed this 25th day of November, 2025.

8

9                                      /s/ _____

10                                       Keith   Chambers II

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28